UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWNTROY COLQUITT,<br><br>    Petitioner,<br><br>    vs.<br><br>R.L. GOWER,<br><br>    Respondent. | No. 2:15-cv-1742-TLN-EFB P<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges a judgment of conviction entered against him on April 25, 2013 in the Sacramento County Superior Court on charges of infliction of corporal injury resulting in a traumatic condition on the mother of his child (Cal. Penal Code § 273.5(a)) and simple assault (Cal. Penal Code § 240). He seeks federal habeas relief on the grounds that his Sixth Amendment rights were allegedly violated by the trial court's failure to provide him with investigative assistance in locating exculpatory witnesses.[1] Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

---

[1] The petition purports to list four separate grounds for relief. The second, third, and fourth grounds are not actually separate claims, however. Rather, they each advance arguments as to how the Court of Appeal misconstrued the record in denying petitioner's Sixth Amendment claim. ECF No. 1 at 6-9.

1

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following summary:

> Defendant Shawntroy Colquitt represented himself at trial (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta* )). He was convicted by a jury of corporal injury resulting in a traumatic condition on the mother of his child (count one; Pen.Code, § 273.5, subd. (a)),1 and simple assault (§ 240), a lesser included offense of assault with a deadly weapon (count two; § 245, subd. (a)(1)). In a bifurcated proceeding, he admitted serving prison terms based on four prior convictions, two of which were for domestic violence. (§§ 667.5, subd. (a), 273.5, former subd. (e)(1) (current subd. (f)(1)).) Sentenced to nine years in state prison, he contends that the trial court's failure to provide him with the means to find and subpoena witnesses violated his Sixth Amendment rights to self-representation and compulsory process and his Fourteenth Amendment right to present a defense. We affirm.
>
> **FACTUAL AND PROCEDURAL BACKGROUND**
>
> *The Complaint*
>
> The original complaint, filed on January 29, 2013, alleged one count of domestic violence occurring on or about January 27, and one prior conviction of the same offense.
>
> *The Preliminary Hearing*
>
> At the preliminary hearing on February 19, the alleged victim, Nancy Simms, testified she and defendant were in an "[o]ff and on" relationship and had an 11–year–old daughter, over whom they shared custody. A court order gave defendant custody during "school time" and gave Simms custody on weekends, holidays, and summer vacation; on weekends, she would pick up the child on Friday after school and return her to defendant on Sunday at 6:30 p.m.
>
> As of January 27, which was a Sunday, Simms and defendant had been living together in an apartment in "the north area" of Sacramento since September 2012. They customarily attended services at Calvary Christian Center, a large church near their residence.
>
> On January 27, at approximately 5:30 p.m., Simms told defendant she wanted to take their daughter somewhere, but he objected because Simms's "time was up." Defendant threatened to call the police to enforce the terms of the custody order as he understood them. Simms replied: "You call them, but I'm still leaving because it's my time."

2

After waiting for defendant to calm down, Simms tried to sneak their daughter out of the apartment. Defendant blocked her way, and an altercation ensued. At some point, defendant picked up a pole lamp and tried to hit her with it; she fended him off, but fell and hit the side of her head. They pushed and shoved each other. She swung at him, then slipped and fell. He got on top of her, grabbed her face, and bit her on the nose and chin. Seeing that her nose was bleeding, she got defendant to let her go and she grabbed a towel and applied pressure to stop the bleeding. She told defendant to leave her alone.

Defendant left and went to the 7:30 p.m. church service. Simms left afterward with their daughter and dropped her off at the children's section of the church. Simms then went to a different part of the church, borrowed someone's cell phone, and called 911; her daughter was back with her by then. As they waited off to the side, Simms saw defendant come out talking to another church member.

A police officer contacted Simms around 9:25 or 9:30 p.m. Later, they went back to Simms's residence, where the police officers saw the bloody towel she had used on her nose in the bathroom. The police took pictures of Simms.

The trial court held defendant to answer, deemed the complaint an information, appointed the public defender's office to represent defendant, and set jury trial for April 11.

*Subsequent Pretrial Proceedings*

On Thursday, April 11, trial was continued to April 17, the following Wednesday. On Friday, April 12, defendant requested pro per status. After giving *Faretta* advisements, the trial court granted defendant's request. The court then told defendant: "We'll notify what is called the pro per coordinator's office. They have investigators that will come and meet with you to coordinate any investigation requests, things like getting your discovery. [¶] They will meet with you, explain the policies and procedures they have and what they do for you. But they are the ones if you have any subpoenas you need to serve or any investigation you need to do, especially of getting the discovery from [the public defender's] office, they will coordinate that for you, sir." The court added: "We will notify them right away this morning and I know your trial is set for Wednesday. So we'll put a rush on them coming to see you. [¶] I don't know [if] they will be able to see you today, but should see you on Monday for sure if not over the weekend."

Defendant stated: "[T]he information that was given at the time, that's not true. I was arrested in church. [¶] Now, the information that was given to the cops was I never attended church, I was never at church. But I have some people of the church who's [sic] going to testify for me."

3

After warning defendant against discussing the substance of his case, the trial court said: "The pro per coordinator will come see you and explain the privileges that you have and then you can discover whatever you need to discover with [the prosecutor] and talk about your case further at your trial date."

On April 22, the case came on for jury trial. Defendant submitted several in limine motions, including one captioned "motion to dismiss for failure to preserve matereial [sic ] witness." The motion states: "Defendant at the time of arrest was coming out of Calvary Christian Center Church from attending 7:00 pm evening service talking to fellow church member George Smith. Arresting Officer Galliano ... exchanged a few words with Smith befor [e] placing defendant in the back seat of police car. Going back to speak with Smith to what regard still remains a mystery. When defend[a]nt was questioned regarding his where abouts he responded 'at the Church for the whole night.' Defendant plead[ed] with Officer Galliano to speak to members of the congregation who were present, which he denied. Defendant[']s Six[th] Amendment rights has been violated. Officer Galliano prevented defendant from preparing and presenting a meaningful defense by failing to preserve a material witness who was aware of the behavior between [defendant] & Simms, who's credible testimony would have shed light on the case in preliminary hearing. Many witnesses who where available had knowledge of defendant[']s whereabouts and alle[ ]ge vict[i]m deceptive behavior. Defendant[']s support of social engag[e]ments at the time of arrest can be found in police report." (*Sic*.)

The trial court asked defendant to explain this motion. Defendant stated: "Okay. At the point of my arrest, it says in the police report, as well, is I was approached by officers. I was in church and I was with members of my church congregation, and they were aware of a lot of things that had went on. And I asked the arresting officer can he take the statements from my credible witnesses. [¶] He put me in the car, went and talked to them, got back in the car and took me off. So I didn't really think too much of it until I got my motion of discovery and they were nowhere to be found. But it says in my police report that I was talking to the people from my church, but he never took the statements that he was supposed to take." (*Sic*.)

The trial court asked: "*Now, you have had an opportunity, have you not, to meet with the pro per coordinator ...? *" Defendant answered*: "I never had the opportunity to sit down and talk to her. There was never—they never— they just told her about me just now*." (Italics added.)

The trial court reminded defendant that he had the right to subpoena witnesses. Defendant answered: "I don't know who they are. They're lost." The court noted: "[I]f you wanted to take some time to discuss possibly, you know, going out and finding witnesses and stuff with [the pro per

4

coordinator], she would be the one to talk to." The court then deferred further argument on both sides' in limine motions until the afternoon session.

During the afternoon session, defendant stated (irrelevantly to the motion then under discussion): "Looking in the police report, [Simms] said something ... took place that never took place. She said the incident happened 30 minutes before police contact. And then—well, 30 minutes before police contact I was in church. [¶] Then she came back at preliminary hearing and admitted that she lied, that I was in church."

When the trial court turned to defendant's motion on material witnesses, the court asked which witness was not secured. Defendant replied: "The person I was with ... George Smith." The court asked what prevented defendant from subpoenaing Smith. Defendant replied: "I don't know where George Smith is at. I don't know where George Smith lives. He's just a person who goes to church." The court asked what the nature of Smith's testimony would be; defendant answered: "That she lied." Defendant admitted that Smith did not see the alleged incident, but added: "[S]he said ... it happened at a specific time."

The trial court indicated it was still unclear why defendant thought Smith's testimony would be beneficial to defendant. Defendant answered: "[Defendant] (myself), Nancy Simms, and [our daughter] have been here the whole night. There was no fighting. There was no arguing. There was nothing."

When the trial court asked why "somebody's observations at the church" were material, defendant stated: "Because there is no blood. There's no—all the things that led to me getting incarcerated. I woulda never went to jail.... If anything, we both woulda went to jail. She woulda went to jail, too. But that didn't happen. [¶] I was lied on ... in order to get me in jail. That's why it is very important that the cop went and talked with the guy. He went and talked to him, came back, never said nothing about it." (*Sic*.)

Eventually, defendant asserted that Smith "knows" that what Simms said about the alleged incident to the police and at the preliminary hearing is "not possible" because "[s]he did this before.... She called the cops on me. She tried to get me arrested." Defendant claimed he had spoken with Smith at some time and Smith told him, " 'Look, leave the girl alone;' " later that night defendant told Simms he could not deal with her and she threatened him with jail; then he tried to have Smith act as a mediator between them, but Smith said, " 'Talk to the pastor,' " and Simms walked off.

The trial court asked if there were any other witnesses besides Smith that defendant thought were critical to his defense; defendant said no.

5

The prosecutor said he never heard Smith's name before that day, any discussion of Smith's possible testimony was speculative, and defendant had not laid a foundation to show Smith could testify as to any relevant facts.

The trial court asked whether defendant's motion sought to dismiss the whole case. Defendant said that it did. The court then ruled:

"I'm going to deny the motion for a couple of reasons.

"First of all, the police don't have an obligation to talk to everybody at the scene of an arrest.

"You know, you say that the police talked to this person. The fact that apparently the police didn't find that person to be a witness worthy of writing a report on suggests maybe that person didn't really have much to say.

"But clearly at that early stage in the proceeding, the police had no obligation just to find a potential witness and preserve them for a defendant. We don't even know you're going to be a defendant at that point. All we know is you're going to be arrested.

"Second, just from your own offer to the Court what this witness would say, this witness would not in any way be truly an exculpatory witness because that person, as you admit, did not observe the offense, or the alleged offense.

"Third, you have given us no reason why, if you do think this is an important witness, you can't send an investigator out, attempt to find him, and bring him to court.

"So for all of those reasons, the motion to dismiss will be denied."

The trial court also reiterated that defendant had the right to send out an investigator to try to find witnesses at the church and suggested he talk to the pro per coordinator about it—"[a]lthough, at this late date, it's going to be hard for you to get that done."

*Trial Evidence*

Simms testified on direct examination along the lines of her preliminary hearing testimony. Defendant cross-examined her, citing supposed discrepancies in the accounts she had given at different times, but did not ask any questions that suggested she had fabricated the incident.

Sacramento Police Officer Sean Cunningham testified he responded to the 911 dispatch on January 27, contacted Simms and defendant at the church, detained defendant, took a statement from Simms, and went to the

6

apartment where the assault occurred. Officer Cunningham observed a swollen reddish mark on the top left side of Simms's head, a bite mark on her nose, and another bite mark on the right side of her face. He did not observe any injuries on defendant.

The People called three witnesses under Evidence Code section 1109: Anita W., Kristina S., and S.G. Anita W. testified that in April and May 2011, while she and defendant were in a domestic relationship, he battered her three times; during the second incident, he bit her under her nose. Kristina S. testified that in February 2006, while she and defendant were in a domestic relationship, he beat her with his fists. S.G. testified that in August 2006, and again in May 2009, while she and defendant were in a domestic relationship, he beat her; on the second occasion, when she was eight months pregnant with twins, he knocked her down, jumped on top of her, and bit her in the face.

Sacramento Police Detective Natalie Medeiros, who had five years of experience in the domestic violence unit, testified as an expert witness on "battered women's syndrome." Detective Medeiros opined that in domestic violence cases there is often a "cycle of violence," wherein tensions build within a relationship until an "abusive event" occurs, followed by a "honeymoon period," which induces the victim to stay in the relationship; this cycle may recur over and over for years before the victim finally decides to report the abuse and seek to prosecute the abuser.

Defendant did not testify or call witnesses. His entire closing argument to the jury was as follows: "Ladies and gentlemen of the jury ..., I really don't have too much of a defense because I don't have no evidence to show you. All I can say is, if you find someone to have lied, don't believe nothing they have to say because, obviously, they are hiding something. And whatever it is they're hiding will have changed the course of actions. That's it."

*People v. Colquitt*, No. C074697, 2015 WL 1348502, at *1-5 (Cal. Ct. App. Mar. 24, 2015), as modified on denial of reh'g (Apr. 22, 2015), review denied (June 10, 2015). Petitioner raised this jury claim with the California Supreme Court and it was summarily denied. Lodg. Doc. No. 14 (Petition for Review); Lodg. Doc. No. 15 (Order Denying Petition for Review).

**II. Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or

7

application of state law. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

/////

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

9

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded

10

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III. Petitioner's Claims**

Petitioner argues that his Sixth Amendment right to represent himself, as set forth by the United States Supreme Court in *Faretta v. California*, 422 U.S. 806 (1975), was violated when he was not provided investigative assistance[3] to locate witnesses relevant to his defense. ECF No. 1 at 4.[4] He acknowledges that the trial court granted his initial request for assistance and assigned him a "pro per coordinator." *Id*. He claims that he did not meet the coordinator until trial, however, by which time it was too late to secure the presence of his desired witnesses. *Id*. The Court of Appeal rejected this claim, reasoning:

> Defendant contends the trial court's "failure to provide [defendant] with the means to find and subpoena witnesses" violated his Sixth Amendment right to represent himself at trial, a violation which is reversible per se. He also contends the court's error violated his Sixth Amendment right to compulsory process and his Fourteenth Amendment right to present a defense, and these violations are not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*).) We conclude these claims lack merit. Defendant has adduced no evidence that the court failed to permit him to represent himself or failed to provide him the means to obtain witnesses. Even assuming the court erred

---

[3] The respondent interprets petitioner's claim to apply specifically to a pro se defendant's right to a 'pro per coordinator.' *See, e.g.,* ECF No. 14 at 21. The court interprets petitioner's claim to implicate a pro se defendant's right to investigative services more generally. *See Davis v. Silva*, 511 F.3d 1005, 1009 n. 4 (9th Cir. 2008) (holding that pro se pleadings should be read generously). In any event, as discussed *infra*, there is no clearly established Federal law which entitles a pro se defendant to any form of investigative assistance.

[4] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

11

in some vague fashion in the provision of pro per services, defendant was not deprived of his right to represent himself or obtain witnesses. Any error was harmless under *Chapman*.

To begin with, the standard for per se reversal does not apply. It is true that if the trial court erroneously refuses to permit a defendant to represent himself, the error is reversible per se. (*People v. Joseph* (1983) 34 Cal.3d 936, 947–948 (*Joseph* ).) But *Joseph* addresses only the total denial of self-representation, not the granting of self-representation with allegedly inadequate services. (*Ibid*.) Defendant cites no authority holding that a grant of pro per status with pro per support services that may be inadequate in some ill-defined way constitutes error reversible per se, and we know of none.

"'[T]he right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary defense services. [Citation.]' [Citation.]" (*People v. Blair* (2005) 36 Cal.4th 686, 732 (*Blair* ).)

"As for the Sixth Amendment, we have recognized that depriving a self-represented defendant of 'all means of presenting a defense' violates the right of self-representation. (*People v. Jenkins* [2000] 22 Cal.4th [900,] 1040 [ (*Jenkins* ) ] [citation].) Thus, 'a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense.' (*Jenkins*, supra, 22 Cal.4th at p. 1040.) ... In the final analysis, the Sixth Amendment requires only that a self-represented defendant's access to the resources necessary to present a defense be reasonable under all the circumstances. (See [ ] *Jenkins*, supra, 22 Cal.4th at pp. 1040–1041.)" (*Blair*, supra, 36 Cal.4th at p. 733.)

Defendant's claim that the trial court failed to help him obtain and subpoena witnesses is founded entirely on his own unsworn assertion—on the last day to begin trial, since he had not waived his speedy trial right—that the pro per coordinator had not yet contacted him. However, unsworn assertions are not evidence.

But even assuming the pro per coordinator had not contacted defendant, the record shows no reason why he could not have so informed the trial court sooner. Defendant cites no authority, and we know of none, holding that the court must personally and proactively monitor whether all resources theoretically available to a pro per defendant are actually being provided. By explaining the pro per coordinator's responsibilities to defendant, the court sufficiently informed him of that means of obtaining and subpoenaing witnesses. If defendant was not getting the benefit of that resource, it was up to him to let the court know that in a timely fashion.

> Absent any evidence that defendant did so, we conclude the court sufficiently honored defendant's constitutional rights to a level of "access to the resources necessary to present a defense" that was "reasonable under all the circumstances." (*Blair*, supra, 36 Cal.4th at p. 733; *Jenkins*, supra, 22 Cal.4th at pp. 1040–1041.)
>
> For the same reasons, defendant has shown no denial of his right to compulsory process.
>
> As to his final claim, the deprivation of his Fourteenth Amendment right to present a defense, defendant fails to show how the absence of George Smith as a witness at trial had this effect. When defendant argued his motion in limine concerning the allegedly unavailable material witness, the trial court took great pains to try to grasp why Smith's testimony would be relevant to defendant's theory of defense (whatever that might be). Having done so, the court concluded that because Smith's hypothetical testimony would be irrelevant, his absence would not deprive defendant of the opportunity to present a defense. (Cf. Evid.Code, § 210 [only relevant evidence admissible].) Defendant fails to show that the court's conclusion was erroneous.
>
> In his appellate brief, defendant asserts: "[Defendant]'s argument at trial, while inarticulate, was clear—while he may have engaged in domestic violence in the past, he did not do so in this case." But defendant does not cite to any evidence presented at trial to support this defense—he cites only to one part of his argument in limine. And, as we have noted, he failed to explain in the course of that argument how Smith could have given any competent evidence to support his claim the alleged assault did not happen. Nor does defendant explain, even on appeal, how a claim of fabrication by Simms could have accounted for the fact that the investigating officer observed injuries on her face shortly after the alleged assault which were consistent with her story that defendant inflicted them by biting her, and with the testimony of defendant's former cohabitants that he had repeatedly injured them in the same way. Thus, even assuming for the sake of argument that the trial court should have done something more than it did to help defendant locate and subpoena Smith, any error was harmless under the *Chapman* standard.

*Colquitt*, 2015 WL 1348502, at *5-6.

### A. Applicable Legal Standards

The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 818. It is the defendant, rather than his counsel, "who must be informed of the nature and cause

13

of the accusation, who must be confronted with the witnesses against him, and who must be accorded compulsory process for obtaining witnesses in his favor." *Id*. (internal quotations omitted). These rights "guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice -- through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence." *Id*. It must be noted, however, that "*Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant." *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curiam).

**B. Analysis**

The entirety of petitioner's habeas claim is premised on the purported failure of the trial court to offer him the investigative services necessary to locate several witnesses that he says were relevant to his defense. Two other claims advanced before the Court of Appeal - denial of compulsory process and deprivation of his Fourteenth Amendment right to present a defense – were not raised in his current petition.[5] The only question, then, is whether clearly established Federal law entitles a pro se defendant to the assistance of an investigator. The court finds that it does not.

The U.S. Court of Appeals for the Ninth Circuit has noted that the Sixth Amendment right to self-representation recognized in *Faretta* does not include "further rights to materials, facilities,

---

[5] Out of an apparent abundance of caution, respondent briefly addressed these claims in his answer. ECF No. 14 at 28. It is clear, however, that these claims were not explicitly raised in the petition. *See* Rule 2 of the Rules Governing § 2254 Cases (requiring all claims to be stated in the petition itself). Regardless, the claims are without merit. Petitioner's right to compulsory process, as the Court of Appeal reasonably decided, was not violated because the trial court assigned him a pro per coordinator and explained the process for subpoenaing witnesses. *Colquitt*, 2015 WL 1348502, at *6. The Court of Appeal went on to note that the trial court was not obligated to proactively monitor access to the coordinator. *Id*. Instead, petitioner should have brought this issue to the trial court's attention in a timely manner. *Id*.; *see also McKaskle v. Wiggins*, 465 U.S. 168, 183-84, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a pro se defendant that would normally be attended to by trained counsel as a matter of course."). Petitioner's Fourteenth Amendment claim is without merit because, as the Court of Appeal reasonably held in its opinion, he failed to explain how the testimony of his desired witness would have supported his theory of the case. *Colquitt*, 2015 WL 1348502, at *6; *Depetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) (applying harmless error analysis to a claim of denial of right to present a defense).

14

or investigative or educational resources that might aid self-representation." *United States v. Wilson*, 690 F.2d 1267, 1271 (9th Cir. 1982). The United States Supreme Court itself has confirmed as much. *See Kane*, 546 U.S. at 10. And although the Ninth Circuit has itself held that investigative assistance should be provided to a defendant where he can demonstrate some need for it, *see, e.g., Williams v. Stewart*, 441 F.3d 1030, 1053 (9th Cir. 2006), such circuit decisions do not establish clear Federal law on their own.[6] *See Marshall*, 133 S. Ct. 1446 at 1450-51 (a federal habeas court may "look to circuit precedent to ascertain whether [a federal appellate court] has already held that the particular point in issue is clearly established by Supreme Court precedent," but may not use lower court authority "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule" or "to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct"); *see also Wright v. Van Patten*, 552 U.S. 120, 124-26, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) (per curiam) (stating that when the Supreme Court's cases "give no clear answer to the question presented . . . it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."). Accordingly, petitioner is not entitled to habeas relief.

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file

---

[6] Furthermore, even under the Ninth Circuit's *Williams* standard, petitioner has not demonstrated the requisite need for investigative assistance as was adequately explained the state Court of Appeals. *Colquitt*, 2015 WL 1348502, at \*6.

15

objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: October 23, 2017.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE